711 A.2d 233

**Lawrence E. LERNER**

v.

**LERNER CORPORATION et al.**

**No. 368, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

June 11, 1998.

2

Price O. Gielen (Cynthis L. Leppert and Neuberger, Quinn, Gielen, Rubin & Gibbler, P.A., on the brief), Baltimore, for Appellant.

Albert D. Brault (James M. Brault, Brault, Graham, Scott & Brault, L.L.C., on the brief), Rockville, for Appellees.

Argued before MURPHY, C.J., and BYRNES, J., and MARVIN H. SMITH, Judge (retired, Specially Assigned).

MARVIN H. SMITH, Judge (Retired, Specially Assigned).

In this case, a "brotherly" dispute, involving two appeals from the same suit in the Circuit Court for Montgomery County plus a cross appeal, we shall affirm the grant of summary judgment in each instance by the trial judge (Ferretti, J.).

Lawrence E. Lerner (Lawrence) was the plaintiff below and is the appellant and cross-appellee here. His brother, Theodore N. Lerner (Theodore), and Lerner Corporation (Lerner Corp. or the Corporation) were the defendants and are the appellees and cross-appellants here. Lerner Corp. is a Subchapter S corporation formed in 1965 by Theodore.[1] The

---

1. The United States Court of Appeals for the First Circuit recently explained a Subchapter S corporation in *A.W. Chesterton Co. v. Chesterton,* 128 F.3d 1 (1st Cir.1997), stating:

**4**

Internal Revenue Code provisions relative to Subchapter S corporations have significance in this litigation, as we shall later develop.

Since 1965 Theodore and Lawrence have been Lerner Corp.'s only stockholders. From 1965 to late 1995, Theodore owned 70 shares or 73.6% of the common stock. Lawrence owned 25 shares or 26.4% of the common stock. Theodore was the Corporation's president and one of its three directors. Prior to 1983, Lawrence was the secretary and a director.

The brothers reached the parting of the ways. In 1985, Lawrence sued Theodore alleging a breach of fiduciary duties and sought dissolution of the Corporation. Theodore then attempted to freeze out Lawrence by way of a reverse stock split that would have required Lerner Corp. to buy out Lawrence's shares at fair value. Lawrence filed a second suit seeking to enjoin the freezeout. This resulted in the first of three trips to the appellate courts of this State by the brothers and Lerner Corp. when Lawrence sought and obtained an interlocutory injunction forbidding the Corporation from carrying out the reverse stock split. In *Lerner v. Lerner,* 306 Md. 771, 511 A.2d 501 (1986), the Court of Appeals affirmed, as Judge Rodowsky put it for the Court, "for reasons having more to do with the law of preliminary injunctions than with the law of minority freezeouts." *Id.* at 772, 511 A.2d at 501,[2]

---

[Subchapter S status under the U.S. Internal Revenue Code] allows shareholders in a small business corporation to avoid the double taxation of income to which shareholders in a Subchapter C corporation are subject. The income of a Subchapter C corporation is taxed first at the corporate level when the company earns income, and a second time at the shareholder level when the shareholders receive the income in the form of dividends. A Subchapter S corporation, in contrast, is not taxed at the corporate level; rather, each shareholder pays income tax individually in proportion to [his or] her share of ownership in the corporation. *See* 26 U.S.C. §§ 1361–1399.

*A.W. Chesterton,* 128 F.3d at 3 (footnote omitted).

2. We note, however, that the Court observed:

Discord within a closely held, general business corporation can conceivably reach the point where eliminating a dissonant minority's interest would not violate the majority's duty to the minority, particularly where matters of business judgment are the subject of controver-

A settlement between the parties was reached on October 16, 1987. Under it Theodore would continue with his then current activities while Lawrence would remain only as a minority stockholder; Theodore was permitted to use Lerner Corp.'s personnel and resources for development opportunities; and Lerner Corp. was not to issue additional shares of common stock without first offering Lawrence the right to purchase his proportionate share at the same price and terms offered to any other party. Integral to the litigation here is that portion of the agreement which stated:

> A payment shall be made by Lerner Corp. to [Lawrence] after the end of each calendar year, beginning with calendar year 1988, equal to [his] proportionate share, based on the percentage of stock ownership, of the difference between the total amount of Lerner Corp.'s management income for such calendar year and the total amount of Lerner Corp.'s business expenses for such calendar year *which relate to management* activities as distinguished from development activities. [Emphasis added.]

Unfortunately, this settlement did not end the acrimony between the parties. As a result, in 1991 Lawrence filed yet another suit against Theodore, Lerner Corp., and some other entities controlled by Theodore. This suit is known by the parties as "the enforcement suit." It reached this Court in *Lerner v. Lerner*, 101 Md.App. 728, No.1914, 1993 Term, per curiam, filed Sept. 30, 1994, known as *"Lerner II."*

Pursuant to the decision of this Court in *Lerner II*, a substantial sum of money was paid to Lawrence with interest. Lerner Corp. then borrowed money to make a proportionate payment to Theodore plus an amount equal to interest on this sum. Thereafter, in December 1995, a stock sale was effected to liquidate this indebtedness.

Lawrence filed this suit on April 28, 1994, while *Lerner II* was pending in this Court. We are here concerned with

---

sy and the discord is impairing the corporation's ability to conduct business.
*Lerner*, 306 Md. at 782, 511 A.2d at 506–07.

**6**

certain portions of the fourth amended complaint. The fourth amended complaint was filed on April 4, 1996. In Count IV Lawrence claimed Theodore was not entitled to any interest on any distribution made to him by the Corporation. Count V sought an injunction prohibiting the distribution of interest to Theodore. On December 4, 1996, summary judgment was granted in favor of Lawrence. An injunction was denied as to payment of interest to Theodore. The declaratory judgment entered declared

> that in computing the payment to be made each year by the Lerner Corporation to Lawrence E. Lerner pursuant to the terms of Paragraph No. 10 of the Settlement Agreement of Litigation and Contemporaneous Releases dated October 17, 1987, any interest paid to Theodore N. Lerner with respect to the distributions to him for the years 1988 through 1992 shall not be considered as a management expense of Lerner Corporation and shall not be subtracted from management income when calculating the payment to be made to Lawrence E. Lerner.

The trial court certified under Maryland Rule 3–602(b) that there was no just reason for delay and that this order should be a final judgment.[3]

Count VIII of the fourth amended complaint sought a declaratory judgment that the Corporation was not required to make a distribution to Theodore, that the distribution to Theodore violated Maryland Code (1975, 1985 Repl.Vol., 1992 Supp.), section 2–311 of the Corporations & Associations Article, and that the Corporation could not raise money to fund the distribution by way of issuance of stock. Count XII (sometimes referred to as the "recoupment claim") sought restoration of Lawrence's stock ownership interest in Lerner

---

3. We note that here we do not have certification of a final judgment where there was only one cause of action but multiple claims as in *Huber v. Nationwide Mut. Ins. Co.*, 347 Md. 415, 701 A.2d 415 (1997); *Medical Mut. Liab. Ins. Soc'y v. B. Dixon Evander & Assocs.*, 331 Md. 301, 628 A.2d 170 (1993); and *Diener Enters. v. Miller*, 266 Md. 551, 295 A.2d 470 (1972) (an opinion by Judge Digges on which others are based), but multiple causes of action.

Corp. following the December 1995 stock sale. The court entered an order on March 26, 1997, granting Theodore's and Lerner Corp.'s motion for summary judgment on Count VIII. It declared:

1.  . . .

2.  The Court grants defendants' motion for summary judgment on count VIII and declares:

(a) Lerner Corporation was not precluded from selling stock on the ground that the sale was intended to raise capital to fund an illegal distribution;

(b) Lerner Corporation was not precluded from selling stock on the ground that the valuation was flawed or inadequate or on the ground that the stock could not adequately be valued;

(c) Lerner Corporation was not required to re-value the stock in order to sell the stock;

(d) that in accordance with this Court's prior ruling on counts IV and V of the fourth amended complaint, plaintiff is entitled to payment by the Corporation equal to his proportionate share of the net profits (as defined in paragraph 10 of the Settlement Agreement), but that the amount of interest paid to Theodore N. Lerner on the distributions for the period 1987 through 1996 cannot be treated as an expense item to reduce the net profits as defined in the Settlement Agreement.

The trial judge entered summary judgment in favor of Theodore and Lerner Corp. on Count XII. He stated from the bench:

Count 12: On Count 12, which [seeks] restoration of the stock ownership and interest of Lawrence E. Lerner, I am going to grant summary judgment to the defendants.

I grant summary judgment on the basis that there is no material issue of fact in this case. There is a presumption that the stock issued is properly valued by the board of directors, which is supported by evidence and by the exhibits attached. There are no counter exhibits. There is no evidence of gross disparity or fraud suggested.

This is a business decision. They had to—they issued the stock and it was not inappropriate to issue the stock. I don't know any facts. I can't imagine any facts that aren't already in this record that can be brought to bear in a trial to modify that presumption.

The orders as to Counts VIII and XII were likewise certified as final judgments. Both sides appealed.

Lawrence sees the issues as:

1.  Did the Circuit Court err in holding that the Corporation could pay interest to [Theodore] pro rata to the interest paid to [Lawrence] pursuant to the judgment in the Enforcement Case, where [Lawrence's] judgment was based upon an express contractual obligation of the Corporation to make annual distributions to [Lawrence], and where interest was paid to [Lawrence] because the Corporation (a) failed to adhere to the plain and specific terms of the Agreement and (b) failed to pay the resulting judgment until it was affirmed by this Court?

2.  Did the Circuit Court err in refusing to set aside the stock sale and restore [Lawrence's] full ownership interest in the Corporation, in light of:

    (a)  evidence that [the] sale was not conducted for a lawful purpose, but rather was intended to raise capital to fund an illegal distribution;

    (b)  the Circuit Court error in holding that it could not set aside the stock sale in the absence of fraud or gross disparity, or even if that test was applicable, it was satisfied; and

    (c)  the Corporation's admission that restoration of [Lawrence's] stock interest is practicable?

3.  Did the Circuit Court err in refusing to order recoupment from [Theodore] of $3 million of the $3.5 million pro-rata payment to [Theodore] in light of:

    (a)  the lack of any legal or contractual basis for the payment of interest to [Theodore]; and

(b)  the fact that the Corporation had to incur debt to fund $3 million of the $3.5 million distribution?

Theodore and Lerner Corp. put the matter more succinctly:

*APPEAL*

1.  Was the circuit court legally correct in declaring that the Corporation was not prohibited from paying interest to [Theodore]?

2.  Was the circuit court legally correct in granting summary judgment on [Lawrence's] claim to have the 1995 stock sale set aside?

3.  Was the circuit court legally correct in granting summary judgment to the appellees on [Lawrence's] claim to have [Theodore] return the distribution he received in 1995 to the Corporation?

*CROSS APPEAL*

4.  Did the circuit court err in declaring that the interest payments to [Lawrence] could not be treated as business expenses and reduced from the Corporation's gross income for purposes of determining the net income to be distributed to shareholders?

We are of the view that the issues before the court are:

1.  Was it legally permissible for Lerner Corp. to pay to Theodore a sum which equaled interest on the distribution to him?

2.  Was Lerner Corp.'s stock sale proper?

All other issues are subsumed into these.

As indicated earlier, these appeals are from grants of summary judgment.  In this instance, unlike many appeals from grants of summary judgment, we are not required to determine whether there was a material dispute as to a material fact that would preclude the grant of summary judgment because here there is no factual dispute.  The disputes relate entirely to the application of law to the facts before the court.

Integral to the decision below and to our decision here is the situation relative to a Subchapter S corporation.  Theodore and the other directors of Lerner Corp. had before them the

advice of their own certified public accountant plus the advice of a national accounting firm and that of a prominent District of Columbia law firm. All were in agreement. The national accounting firm advised:

> [W]e have analyzed the tax consequences of the proposed distribution of funds to Lawrence E. Lerner. It is our understanding that the potential distribution calls for a payment to Lawrence E. Lerner of $926,449, which represents two components:
>
> | | |
> |---|---:|
> | Lawrence's share of the S corporation's accumulated but undistributed earnings as of 12/31/92 | $805,325 |
> | An interest factor to account for the lack of use of the undistributed earnings | 121,124 |
> | Total | $926,449 |
>
> Since Lerner Corporation is a Subchapter S corporation, it is required under the Internal Revenue Code ("IRC") to have only one class of stock. According to the IRC, if an S corporation does not make prorata distributions, a second class of stock could exist with respect to distribution rights. Should two classes of stock exist, IRC regulations require the corporation's S corporation status be terminated and be converted to a Subchapter C corporation. As a C corporation the entity would now be subject to taxation both at the corporate level and at the shareholder level. This would severely impact the value of the shareholder's interest in the corporation since there would be less cash flow available to the shareholder's [sic] due to the fact that the corporation would now be paying income taxes.
>
> As a result, we would recommend that if Lerner Corporation must distribute $926,449 to Lawrence E. Lerner, it should also distribute $2,582,828 to Theodore N. Lerner in order to protect its S corporation status. This would require a total distribution of $3,509,277 to the shareholders.

The law firm said:

> You have requested our opinion whether, when the Company makes the distribution to Lawrence E. Lerner mandated by the Court's decision, it has a concomitant obli-

gation to make a proportionate distribution to its other stockholder, Theodore N. Lerner. You have also requested our opinion whether, if the Company fails to make a proportionate distribution to its other stockholder, such failure would adversely affect the Company's continued ability to be taxed as a Subchapter S corporation for federal and Maryland income tax purposes.

. . . .

... If Paragraph 10 of the Settlement Agreement is interpreted as creating a priority distribution in favor of Lawrence E. Lerner, it is our opinion that the Company will not satisfy the "1 class of stock" requirement of Section 1361(b)(1)(D) and, therefore, will cease to qualify as an S corporation, with the resulting loss to the Company and its shareholders of the federal and Maryland income tax benefits conferred by its status as an S corporation.

There was presented to the circuit court judge the deposition of Sheldon S. Cohen, an attorney who was an expert in the field of taxation and happened also to be a former Commissioner of Internal Revenue. He concurred in these views. Lawrence has presented nothing to the contrary.

## INTEREST

It is important to understand that although the parties have referred to the payment to Theodore as "interest," it in fact was not interest. Pursuant to the agreement Lawrence was paid a specified sum. Then, he was paid interest on that sum. In the case of Theodore he, as a Subchapter S stockholder, was paid from the Corporation a sum of money which in proportion to stock holdings was equal to the sum paid Lawrence. Then, also, because of Subchapter S tax status, the payment that has been referred to as "interest" was paid to him. It likewise was in mathematical proportion to the sum paid Lawrence as interest.

Lawrence makes three arguments that the distribution of what he calls "interest" to Theodore was improper. First, he asserts Theodore was not entitled to interest because he,

unlike Lawrence, had no contractual right to receive interest. Second, Lawrence argues the payment of interest was not a dividend but a gift. Finally, he asserts the payment was not fair or equitable to the Corporation and constituted an unlawful self-interested transaction.

Lawrence is correct in asserting Theodore had no contractual right to receive the interest payment. The payment of interest to Lawrence was because of the final judgment rendered by the circuit court in *Lerner II*. The payment of "interest" to Theodore was premised on the need of the Corporation to maintain its Subchapter S tax status.[4] Accordingly, it is immaterial whether Theodore had a contractual right to the interest payment. The issue is whether such payment was unlawful. Likewise, Lawrence's characterization of the distribution as a gift is unavailing. The issue is whether the directors of the Corporation could authorize such a payment.

■ This distribution of interest to Theodore does not impinge upon Lawrence and what he is to receive from the Corporation. The agreement between the parties provides for him to receive a designated portion "of the difference between the total amount of Lerner Corp.'s management income for such calendar year in the total amount of Lerner Corp.'s business expenses for such calendar year which relate to management activities as distinguished from development activities." Under the holding of Judge Ferretti, which we shall affirm in the cross appeal, that interest is not chargeable as a business expense. Thus, Lawrence is not injured.

As Theodore and Lerner Corp. put it in their brief, "The issue is not whether the Corporation was obligated to pay interest to [Theodore]; it is whether the Corporation was

---

4. Lawrence attempts also to argue that this Court in *Lerner II* decided that a dividend did not need to be paid to Theodore and that the issue is *res judicata*. Lawrence mischaracterizes the Court's holding in *Lerner II*. The Court in that case held that the distribution to Lawrence could not be withheld on the ground that the Corporation had insufficient cash to make a distribution to Theodore. We did not hold that a distribution could not be made to Theodore.

prohibited from doing so." This was a corporate decision by the Board of Directors under its authority in Maryland Code (1975, 1985 Repl.Vol.), § 2–401 of the Corporations and Associations Article (CA), based on the advice it received pertaining to the maintenance of Subchapter S tax status.

Lawrence has argued, "It is well established that majority shareholders in a closely held corporation, as well as the officers and directors, owe fiduciary duties to minority shareholders."

The United States Court of Appeals for the First Circuit in *A.W. Chesterton Co. v. Chesterton*, 128 F.3d 1 (1st Cir.1997), examined an issue the converse of that in this case. Instead of seeking to preserve Subchapter S status, a minority shareholder, discontent because he was unable to sell his shares, sought to transfer his shares to two shell corporations that were owned by him. The transfer would have destroyed the corporation's Subchapter S status. Accordingly, the corporation and its shareholders sought to enjoin the transfer.

The district court enjoined the transfer. The Court of Appeals for the First Circuit affirmed. It noted the minority shareholder owed a duty of good faith and loyalty to the corporation. It held the minority shareholder breached that duty by seeking to transfer his shares to two shell corporations and destroy Subchapter S status for the corporation. The court reasoned:

> If Chesterton were to effectuate his proposed transfer, the Company and its shareholders would lose the substantial benefits they have derived from the Company's Subchapter S status. Such benefits are likely to continue if the Company maintains its Subchapter S status. Chesterton, disgruntled with overall Company performance and in pursuit of his own self-interest, has threatened to destroy these substantial benefits.... [W]e decide ... that the district court did not abuse its discretion in holding that he has not acted fairly towards [the other shareholders].

*Id.* at 6.

This case indicates that if Lawrence and the other directors did not act to preserve the Corporation's Subchapter S status,

they would have breached their fiduciary duty to the Corporation. By acting to preserve the favorable tax status, Theodore and the other directors did not act unfairly toward Lawrence. It was in the interest of all, the Corporation, Lawrence, and Theodore, that Subchapter S status be maintained.

Lawrence asserts the distribution to Theodore was unlawful because it was in violation of section 2–311 of the Corporations and Associations Article. This section provides:

(a) *In general.*—No distribution may be made if, after giving effect to the distribution:

(1) The corporation would not be able to pay indebtedness of the corporation as the indebtedness becomes due in the usual course of business; or

(2) The corporation's total assets would be less than the sum of the corporation's total liabilities plus, unless the charter permits otherwise, the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of stockholders whose preferential rights on dissolution are superior to those receiving the distribution.

CA § 2–311(a).

It is undisputed that after the distribution to Theodore was made, the Corporation's liabilities exceeded its assets. Lawrence argued below that the Corporation's liabilities exceeded its assets by approximately $300,000. Theodore and Lerner Corp. do not dispute that the Corporation's liabilities exceeded its assets for the period of time between the distribution and stock sale. Nevertheless, they make three arguments relating to the alleged violation: (1) Lawrence has no standing to assert a violation of section 2–311, (2) section 2–311 was never violated, and (3) the liabilities of the Corporation exceeded its equity for a short period of time and therefore any deficiency was cured.

Section 2–312 of the Corporations and Associations Article defines the liability to be imposed for a violation of section 2–311. The section states:

If it is established that the director's duties were not performed in compliance with § 2–405.1 of this title, a director who votes for or assents to a distribution made in violation of the charter § 2–311 of this subtitle is personally liable to the corporation for the amounts of the distribution that exceeds what could have been made without violating the charter or § 2–311 of this subtitle.

CA § 2–312.

█ This statute does not support Lawrence's argument concerning the distribution for two reasons. First, Lawrence seeks to void the entire distribution made to Theodore. This section makes clear that the directors are liable only for the portion of the distribution "that exceeds what could have been made without violating the charter or § 2–311 of this subtitle." Most of the distribution made to Theodore did not violate section 2–311.

█ Second, the statute indicates that a director who approves a distribution in violation of section 2–311 "is personally liable to the corporation." CJ § 2–312. Accordingly, it is the corporation that has standing to bring a claim against a director for violation of section 2–311. Authority for this position can be found in section 5437 of *Fletcher Cyclopedia of the Law of Private Corporations*, which provides: "The Model Business Corporation Act and most statutes make directors personally liable for the distribution of unlawful dividends only to the corporation. Since the liability extends to the corporation, a shareholder may bring a derivative suit on its behalf where the directors refuse to bring suit." (Footnotes omitted.) Lawrence in this case brought a direct suit against Theodore and Lerner Corp., not a derivative action on behalf of the Corporation. Accordingly, he has no standing to sue for a violation of section 2–311 in this context.

█ Lerner Corp. and Theodore also argue section 2–311 was never violated. They state there was no violation because the directors considered that "the Corporation was going to have an infusion of capital through a stock sale and that the additional capital would be used to pay off the bank loan."

The Corporation and Theodore are correct in noting the directors are entitled to consider a corporation's current and future sources of cash. The official comment to section 6.40 of the Model Corporation Act, which is similar to section 2–311, provides: "[I]n determining whether the equity insolvency test has been met, certain judgments or assumptions as to the future course of the corporation's business are customarily justified, absent clear evidence to the contrary." *See also* 11 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 5329.10 (perm. ed. rev.vol.1995) ("The directors are entitled to make certain, reasonable judgments or assumptions about the future course of the corporation's business.... The directors may utilize a cash flow analysis based on a business forecast and budget for a sufficient period of time and draw [a] conclusion that the corporation can reasonably expect to satisfy known obligations as they mature over that period." (footnotes omitted)).

Under these circumstances, it was reasonable for the directors of Lerner Corp., in determining whether the Corporation would remain solvent, to consider that the Corporation was going to raise additional cash by issuing additional stock, that the Corporation would be able to pay its debts as they became due, and that the loan utilized to fund the distribution to Theodore was guaranteed by an entity owned by Theodore. Therefore, there would be no violation of section 2–311 so long as the board exercised its discretion in good faith. There is no assertion by Lawrence that the board members acted other than in good faith.

In conclusion, Lawrence may not invalidate the entire distribution made to Theodore because only a portion of it caused the Corporation to be insolvent. As to the portion that caused the Corporation to be insolvent, Lawrence is not entitled to assert a direct claim, as he did in this case, for violation of section 2–311. His only relief is by way of derivative action on behalf of the Corporation. Because he did not institute such an action, he is not entitled to relief on his claim. Finally, there was no violation of section 2–311 because the directors of a corporation may consider future cash flow in making a

distribution. In this instance, the directors considered the impending stock issuance as a method by which the Corporation was to receive additional cash. Moreover, the distribution was made for the valid business purpose of maintaining Subchapter S status which was in the best interest of *both* stockholders. We perceive no error.

## THE STOCK SALE

Lawrence argues:

The stock sale was undertaken for the unlawful purpose of funding an unlawful distribution. The distribution made to [Theodore] in 1995, of $3.5 million, which was his "pro rata" distribution based upon the $1.18 million distribution to [Lawrence], was wrongful and unlawful because (1) it included a gift of interest greater than $1.1 million, (2) it violated § 2–311 of the Corporations and Associations Code [sic] because, after giving effect to the distributions, the Corporation's assets were less than its liabilities, and (3) after giving effect to the distributions, the Corporation would not be able to pay its indebtedness as it became due in the usual course of business.

As we have already set forth above, the distribution was lawful in that it was seen as an essential of maintaining a Subchapter S corporation. What we have previously said relative to "interest" and section 2–311 is applicable here as to insolvency.

The facts of this case indicate the stock issuance was fair. Lerner Corp. employed experts to place a value on the stock. A sufficient number of shares were offered to Lawrence so that his stake in the Corporation would not be diluted. Additionally, the purpose of the stock sale was to fund the distribution to Theodore and the distribution to Theodore was fair because it was undertaken in order to maintain Subchapter S status. The stock issuance itself had a proper purpose.

"Subject to the provisions of this subtitle, a corporation from time to time may issue ... [s]tock of any class autho-

rized by its charter. . . ." CA § 2–201. Before issuing stock, the directors must adopt a resolution setting the price for the stock. CA § 2–203(a)(2). In performing their duties, including setting a price for stock, the directors are "entitled to rely on any information, opinion, report, or statement, including any financial statement or other financial data, prepared or presented by . . . [a] lawyer, certified public accountant, or other person, as to a matter which the director reasonably believes to be within the person's professional or expert competence." CA § 2–405.1(b)(1)(ii). The price set by the board is conclusive in the absence of "actual fraud in the transaction." CA § 2–203(b); *see also* CA § 2–205(b) (stating value set by board of directors is conclusive "[i]n the absence of actual fraud or gross disparity")

Lawrence asserts the fraud standard is not applicable in this case because Lerner Corp. and Lawrence have a contract between them. Lawrence notes all contracts contain an implied term of good faith and fair dealing. He concludes that there is a duty of good faith and fair dealing between himself and the Corporation. Lawrence argues the directors acted in bad faith in setting the value for the stock.

The good faith and fair dealing standard is not the appropriate standard under these circumstances. The contract negotiated between Lawrence and Lerner Corp. related to distributions of a portion of "management income" from management activities. The contract did not contain terms relating to any subsequent stock issuance by the Corporation except that in the case of stock issuance, Lawrence was to have the right to purchase his proportionate share at the same price and terms offered to any other party. This was offered to him. Accordingly, the implied good faith term is not applicable when dealing with the issuance of stock in this instance.

The appropriate standard, as the trial court found, was the fraud/gross disparity standard. Lawrence in his brief points out numerous possible flaws in the Valuations Counselor's second valuation, upon which the stock sale was based. He, however, fails to show how or why the valuation was fraudu-

lent. Additionally, the board of directors, as it is permitted to do by statute, relied upon the expertise of Valuation Counselors in setting the price for the stock. We perceive no error.

## RECOUPMENT

The arguments for recoupment are effectively answered by that which we have set forth above. Theodore and Lerner Corp. did nothing wrong. Thus, there is no basis for recovery by Lawrence.

## THE CROSS APPEAL

Theodore and Lerner Corp. argue that the circuit court erred in declaring that the "interest" paid to Theodore could not be considered in the calculation of Lawrence's proportionate share of "net income." No citations of authority are presented. We think it is not properly a part of the expense of operation of Lerner Corp. Thus, we perceive no error.

**JUDGMENTS AFFIRMED; COSTS TO BE EQUALLY DIVIDED.**