915 A.2d 991

**STORETRAX.COM, INC.**

v.

**Joshua GURLAND.**

**No. 40, Sept. Term, 2006.**

Court of Appeals of Maryland.

Feb. 6, 2007.

38

Ronald L. Early (Jennifer S. Thomas of Lerch, Early & Brewer, Chartered of Bethesda, on brief), for petitioner.

Thomas D. Murphy (James A. Mood, Jr. of Murphy & Mood, P.C. of Rockville), on brief, for respondent.

BELL, C.J., RAKER,* WILNER, CATHELL, HARRELL, BATTAGLIA, and GREENE, JJ.

HARRELL, J.

This case considers whether a member of a corporation's board of directors breached his fiduciary duty owed to the

---

* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

corporation when he, removed as an employee of the corporation, filed suit against the corporation in order to enforce severance pay provisions of his employment agreement, pursued summary judgment by default after the corporation failed to file a timely answer, and sought to enforce his money judgment, over the corporation's opposition, by attaching the bank account of the corporation. The Circuit Court for Montgomery County held that the board member did not breach his fiduciary duty. The Court of Special Appeals affirmed. We also shall affirm.

## I. Background

Petitioner, Storetrax.com, Inc. ("Storetrax"), is a Delaware corporation with its principal place of business in Rockville, Maryland. Storetrax operates an internet-based commercial real estate listing service marketed principally to lessors of retail rental space. The business was founded originally in 1997 by Respondent, Joshua A. Gurland ("Gurland"), and incorporated in January 1998. On 25 October 1999, Respondent entered into a written agreement with a group of investors who acquired a majority interest in Storetrax's shares. Gurland remained a member of the board and, in conjunction with the stock sale, executed an employment agreement with Storetrax whereby he was named president and chief executive officer of the corporation.[1]

The terms of the employment agreement provided for successive one-year terms, renewed automatically unless either

---

1. In January 2000, one of the investors and co-chair of the board of directors, Robert Rosenfeld, expressed interest in becoming the chief executive officer (CEO) of Storetrax. Gurland agreed, and relinquished the title to Rosenfeld. Gurland remained president of the corporation. In early 2001, Rosenfeld resigned as CEO of the corporation, and Thomas McCabe was hired in April 2001 to replace him. Gurland was asked by senior management to surrender the title of president so that McCabe could serve as both CEO and president. Gurland complied, and assumed the new title of Senior Vice President of Technology and Strategy. He remained in this position until his employment with Storetrax was terminated in November 2001. During the summer of 2001, McCabe was replaced as CEO and president of the corporation by Elizabeth Stewart. Stewart terminated Gurland in November 2001.

party notified the other in writing "not less than ninety (90) days prior to the expiration of the Initial Term or any renewal term." Storetrax further could terminate the agreement at any time, with or without cause, upon ten days written notice. The termination clause provided the following language:

> In the event that this Agreement is terminated by [Storetrax] for Cause ..., the Company shall pay the Employee the Base Salary due him under this Agreement (plus all accrued and unpaid benefits and reimbursable expenses) through the day on which such termination is effective, in accordance with the Company's normal payroll practices. In the event that the Employee is terminated without Cause, the Company shall, subject to the provisions of this Agreement and in lieu of any other payment, pay to the Employee compensation equal to twelve (12) months of the Employee's Base Salary as of the date of termination (plus any earned bonuses and all accrued and unpaid benefits and reimbursable expenses), payable in accordance with normal payroll practices.

Gurland's employment was terminated by the corporation on 15 November 2001. Respondent continued to serve on the board of directors, however, until he resigned from that position on 5 December 2002.

A dispute arose between the parties whether Gurland was entitled to the twelve months severance payment provided for by the termination provision of the employment agreement. Gurland drafted and delivered on 11 December 2001 a letter addressed to Storetrax and its board of directors outlining what he perceived to be his entitlement to severance payment. He stated:

> I regret that we have come to this point, and sincerely hope that we can resolve the severance issue amicably and in a timely fashion. However, I have consulted an attorney and will not hesitate to avail myself of every possible remedy in the event of dispute. If the issue remains unresolved as of [21 December 2001] I will instruct my attorney to proceed.

On 20 December 2001, counsel for Storetrax responded in a letter which communicated the board of directors' view that Respondent was not entitled to severance payment. Specifically, the letter took the position that, because of the frequent changes in Respondent's job title and related downward adjustments in his salary, the employment agreement was no longer in effect. Alternatively, the letter explained that, even if the agreement remained valid, "cause" existed for the termination.[2] The letter concluded

[t]here is still an opportunity to part on amicable terms, provided that you withdraw your demand for severance. If you desire to litigate this issue, the Company is prepared to defend itself, as well as to assert any counterclaims it may have against you for breach of your fiduciary duties as an executive and Director of the Company.

The senior management of Storetrax and the Board of Directors (excepting yourself) have each reviewed this letter and the facts surrounding your demand for severance. Everyone concurs with the Company's refusal to consider any severance package.

In January 2002, a member of Storetrax's board attempted to settle the severance pay dispute. The board of directors communicated to Respondent a settlement offer. Respondent assured the board that he would consider the offer. There was no further correspondence between the parties.

Gurland filed in the Circuit Court for Montgomery County on 31 January 2002 a complaint against Storetrax alleging breach of contract and seeking $150,000.00 in severance pay under the termination provisions of the employment agreement. He joined with the complaint a motion for summary judgment. Subsequent to filing the complaint, Respondent

---

2. In the 20 December 2001 letter, counsel for Petitioner cited to several instances where the corporation's senior management had called into question Respondent's job performance. These examples included the downward spiral of Respondent's job titles, his refusal to participate in activities which would contribute to Storetrax's success (e.g., sales), his refusal to reconnect the company's network server unless he w as granted a salary increase, and his engaging in behavior aimed at undermining employee morale.

visited Petitioner's office on two occasions, but did not inform anyone there of the pendency of the suit.

Pursuant to Maryland Rule 2–124(d), service of process was made upon Storetrax's resident agent on 1 February 2002. Despite proper service of the summons, complaint, and motion for summary judgment, the resident agent failed to deliver to the corporation the documents.[3] As a result, Storetrax failed to file a timely answer to the complaint, or a timely response to the summary judgment motion. The Circuit Court granted, by way of default, Respondent's motion for summary judgment on 8 March 2002, entering against Petitioner a judgment in the amount of $150,000. Respondent, in an effort to enforce the money judgment entered in his favor, petitioned ten days later for a writ of garnishment attaching Storetrax's bank account.[4] The Circuit Court issued the writ on 19 March 2002.

Petitioner had no actual notice of the suit until it received on 19 March 2002 notice of the attachment on its bank account. The following day, Storetrax's bank garnished the corporation's account in the amount of the judgment. Counsel for Storetrax wrote a letter to Gurland on 21 March 2002 requesting that he agree "(1) to voluntarily set aside [the] default, and (2) to withdraw the garnishment of the Company's bank account," thus enabling the corporation to answer the

---

**3.** According to the record, an independent contractor had been engaged by the registered agent to receive and forward service of process on behalf of the registered agent.

The independent contractor used an outdated address it had on file for Petitioner, and the papers were therefore un deliverable. When the papers were returned to the contractor on 4 February 2002, the contractor attempted to mail the documents to the registered agent so that the agent itself could forward the documents to the correct address. The agent's employee to whom the packet was sent, however, had "walked out" on her job on or around 4 February 2002. The court papers remained on her former desk until discovered on 20 March 2002. Notice of the entry of summary judgment by default subsequently was mailed to Storetrax's resident pursuant to Maryland Rule 2–501(f). For the same reasons described above, this notice likewise was not delivered timely to Storetrax.

**4.** Pursuant to Maryland Rule 2–632(b), a ten-day stay is imposed for enforcement of a monetary judgment after its entry.

suit and have its day in court. Respondent refused. Petitioner filed on 3 April 2002, pursuant to Maryland Rule 2–535, a motion to set aside the summary judgment entered by default. Storetrax also filed a motion to quash the writ of attachment. The trial court denied both motions, and Storetrax noted an appeal to the Court of Special Appeals. The intermediate appellate court, in an unreported opinion, reversed the judgment, holding that it was an abuse of discretion for the Circuit Court to deny Storetrax's motion to set aside the summary judgment. The case was remanded to the Circuit Court for further proceedings. On the eve of trial, Gurland moved for partial summary judgment as to whether Storetrax had terminated him for cause. The trial court granted this motion. The case proceeded to trial to determine the remaining issues. A jury returned a verdict in favor of Gurland in the amount of $150,000.

While Storetrax's appeal was pending from the judgment in Gurland's favor in the breach of contract action, Storetrax filed suit against Gurland in the Circuit Court on 8 November 2002, alleging primarily that Gurland, by pursuing his claim to judgment, breached the fiduciary duty that he owed to the corporation by virtue of his membership on the board of directors. Petitioner asserted that "[a] s a director, Gurland owed fiduciary duties of due care, loyalty, and good faith to Storetrax." Specifically, Petitioner alleged that Respondent breached this duty despite knowing that Storetrax was insolvent at the time of the lawsuit [5] and vehemently opposed and had a viable defense to the breach of contract claim. More-

---

**5.** Storetrax alleged in its complaint that it was unable to pay its debts in the ordinary course of business. Because of Gurland's position on the board of directors, according to the corporation, he would have been aware of the financial position of the corporation at the time he filed his lawsuit regarding severance pay and all relevant times until he resigned from the board on 5 December 2002.

The Circuit Court determined, however, that
the evidence is unclear as to whether the corporation was insolvent because the corporation was still a growing concern, had the power to draw down and use $500,000.00 investment funds as a cover for debts, and it is still a growing concern today. Had Mr. Gurland

over, Gurland: (1) never advised the corporation of the existence of his lawsuit in spite of several visits to the corporation's offices subsequent to the filing of his complaint; (2) concealed the existence of the lawsuit in order to obtain garnishment, which was aimed at disrupting the corporation's daily operations; (3) obtained summary judgment by default despite knowing that the corporation opposed his breach of contract claims; (4) attached Storetrax's bank account in the amount of the judgment; and (5) opposed all attempts to have the judgment and garnishment set aside, notwithstanding express requests from Storetrax's senior management that he acquiesce. The breach of fiduciary duty claim was tried at a bench trial in March 2004. The trial court found in favor of Gurland.

Petitioner appealed the trial court's judgment in the breach of fiduciary duty case also. The Court of Special Appeals consolidated the two appeals for oral argument. The intermediate appellate court issued on 31 March 2006 a reported opinion reversing the Circuit Court's grant of partial summary judgment in the contract case on the basis that there was a triable question whether Gurland was dismissed "with cause." *See generally Storetrax.com, Inc. v. Gurland*, 168 Md.App. 50, 67–77, 895 A.2d 355, 365–71 (2006). The court affirmed, however, the trial court's determination that Respondent had not breached his fiduciary duty owed the corporation as a director. *Storetrax*, 168 Md.App. at 80–88, 895 A.2d at 373–77. Storetrax petitioned us for a writ of certiorari to consider the Court of Special Appeals's decision relative to Gurland's alleged breach of fiduciary duty.[6] We issued a writ of certiorari, 393 Md. 477, 903 A.2d 416 (2006), in order to address the following issue:

given prior notice, outside of the normal legal process, of a request to seek garnishment, a reasonable corporation would have taken steps, as was their right, to frustrate Gurland's efforts to collect what Mr. Gurland then believed to be a legitimate judgment.
We shall return to the trial court's determination later in this opinion.

**6.** Respondent did not seek review by cross-petition of that part of the intermediate appellate court's decision regarding the contract case.

Did the Court of Special Appeals err in finding that a member of the board of directors of a corporation did not breach his fiduciary duties to the corporation when he sued for severance payment in his capacity as an aggrieved former employee, obtained summary judgment by default when the corporation failed to file an opposition to the motion for summary judgment, attached the bank accounts of the corporation in order to enforce the resultant monetary judgment, and opposed the corporation's efforts to have that judgment and garnishment set aside? [7]

## II. STANDARD OF REVIEW

 Pursuant to Maryland Rule 8–131(c) (2006 Repl. Vol.), "[w]hen an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." When reviewing the findings of fact of the Circuit Court, we determine not whether the court's conclusions of fact were correct, but whether they were supported by a preponderance of the evidence adduced at trial. *Urban Site Venture II Ltd. P'ship v. Levering Assocs. Ltd. P'ship*, 340 Md. 223, 229–30, 665 A.2d 1062, 1065 (1995) (citing *Ins. Comm'r v. Nat'l Bureau*, 248 Md. 292, 305, 236 A.2d 282, 289 (1967)). When an appellate court reviews a trial court's determinations of legal questions or conclusions of law based on those findings of fact, however, the clearly erroneous standard does not apply. *Heat & Power Corp. v. Air Prods. & Chem. Inc.*, 320 Md. 584, 591, 578 A.2d 1202, 1205 (1990). Instead, it reviews *de novo* the trial court's relation of those facts to the applicable law. *Space Aero Prods. Co. v. R.E.*

---

7. The question framed in this opinion has been reworded from that presented in the petition for the sake of clarity and completeness. The question presented in Storetrax's petition read as follows: "Did the Court of Special Appeals err in finding that Gurland did not breach his fiduciary duties to the corporation when it was insolvent?"

*Darling Co.,* 238 Md. 93, 208 A.2d 74 (1965) ("[W]hen an action has been tried by the lower court without a jury, the judgment of the lower court will not be set aside on the evidence unless clearly erroneous. If there is substantial evidence to support the lower court's factual conclusion, that finding must be reviewed in the light most favorable to the prevailing party below. The conclusions of law based upon the facts, however, are reviewable by this Court.") (internal citations omitted).

In other words, in order to determine in the present case whether Gurland's actions constituted a breach o f his fiduciary duty owed to the corporation, this Court must undertake appellate review of the trial court's disposition in two stages:

> First, we review for clear error the Circuit Court's underlying findings of facts, leaving them undisturbed if supported by a preponderance of the evidence. Second, applying a *de novo* standard, we must determine whether the trial judge correctly concluded that the facts, as he found them to be, legally constituted a breach of fiduciary duty and bad faith.

*Della Ratta v. Larkin,* 382 Md. 553, 577, 856 A.2d 643, 657 (2004) (holding that the evidence adduced at trial was sufficient to support a trial court's finding that a general partner in a limited partnership breached his fiduciary duty owed to the other partners).

## III. DISCUSSION

The Circuit Court's findings of fact were supported amply by the record. The facts pertinent to this case were at the outset largely undisputed. The employment agreement set out in detail the termination provisions at the center of the controversy. The written correspondence between the parties supports the Circuit Court's findings as to Gurland's notice to the corporation that a court action would commence in the event that the parties were unable to resolve amicably the severance pay issue arising out of his termination. Neither Gurland nor Storetrax point in their briefs to any evidence contradicting the Circuit Court's factual determinations. Thus, we accept the trial court's findings of fact as supported by a preponderance of the evidence.

The primary issue before this Court, therefore, is whether the trial court applied properly the pertinent law to its findings of fact in reaching the conclusion that Gurland, by his conduct in pursuing his severance pay claim, did not breach his fiduciary obligations owed to Store trax by virtue of his membership on the corporation's board of directors.

### A. A Nod to Choice of Law Principles

■ The parties expressed ambivalence before the Court of Special Appeals and here whether Delaware[8] or Maryland law should control the disposition of this case. Even though Storetrax is a Delaware corporation, all the events giving rise to the relevant cause of action occurred in Maryland.[9]

■ As the Court of Special Appeals determined, the "internal affairs doctrine" probably required that the Circuit

---

8. Pursuant to Maryland Code (1957, 2006 Repl.Vol.), Courts and Judicial Proceedings Article, § 10–504,

> [a] party may ... present to the trial court any admissible evidence of foreign laws, but, to enable a party to offer evidence of the law in another jurisdiction or to ask that judicial notice be taken of it, reasonable notice shall be given to the adverse parties either in the pleadings or by other written notice.

See also Maccabees v. Lipps, 182 Md. 190, 195–96, 34 A.2d 424, 426–27 (1943); Prudential Ins. Co. v. Shumaker, 178 Md. 189, 197–98, 12 A.2d 618, 622 (1940). When a litigant seeking to rely on foreign law fails to notify the opposing party of such an intent, and there is no waiver of notice by the opposing party, the law of the foreign jurisdiction will be presumed to be the same as that of Maryland. See Maccabees, 182 Md. at 195–96, 34 A.2d at 426–27. Notice may be given at any time up to the start of trial. Frericks v. Gen. Motors Corp., 274 Md. 288, 297, 336 A.2d 118, 124 (1975). The purpose behind this notice requirement is to prevent unfair surprise and to allow the adverse party to prepare his or her legal arguments based on the laws of the foreign jurisdiction. Frericks, 274 Md. at 296, 336 A.2d at 123. Storetrax stated in its pre-trial opposition to Gurland's motion for summary judgment that "Storetrax.com is a Delaware corporation with its principal place of business in Rockville, Maryland. The issue of Gurland's breach of his fiduciary duty to Storetrax is governed substantively by Delaware law. Restatement (Second) of Conflict of Laws § 309." In an accompanying footnote, Storetrax stated expressly its intention to rely upon Delaware law.

9. Specifically, the Circuit Court held relevantly that

Court apply Delaware law to the present case. That doctrine has been annunciated by this Court as:

> With regard to foreign corporations, Maryland courts have traditionally declined to interfere in management disputes under the "internal affairs doctrine." *See, e.g., Berger v. Bata Shoe Co., Inc.,* 197 Md. 8, 78 A.2d 186 (1951); *O'Hara v. Frenkil,* 155 Md. 189, 141 A. 528 (1928); *Condon v. Mutual Reserve Fund Life Assn.,* 89 Md. 99, 42 A. 944 (1899); *North State Copper & Gold Min. Co. v. Field,* 64 Md. 151, 20 A. 1039 (1885); *Wilkins v. Thorne,* 60 Md. 253 (1883). As described by the Supreme Court in *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982): "[t]he internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs-matters peculiar to the relationships among or between the corporation and its current officers, directors, and share-holders-because otherwise a corporation could be faced with conflicting demands." 457 U.S. at 645, 102 S.Ct. at 2642.

*N.A.A.C.P. v. Golding,* 342 Md. 663, 673–74, 679 A.2d 554, 559 (1996). Thus, the laws of the state of incorporation generally will govern matters involving the internal workings of a corporation except where, considering a set of common law factors annunciated in the Restatement (Second) of Conflicts of Laws,[10] a different state has the most significant relationship with the controversy.

---

> Maryland is not merely the state of trial. Although Storetrax is a Delaware corporation, the Plaintiff's principal place of business is in Maryland. The Defendant resides in Maryland. The alleged breach of contract concerning the severance payment occurred in Maryland. The Court takes further judicial notice that the aforesaid contract was to be construed in accordance with Maryland law. The original suit for breach of contract was filed in Maryland and reversed by the Maryland Court of Special Appeals. The alleged breach of fiduciary duty by Mr. Gurland took place in Maryland. In short, both Plaintiff and Defendant had all contracts and a more significant relationship with the State of Maryland.

(citations omitted).

10. Restatement (Second) of Conflicts of Laws § 6 provides the follow-ing six choice-of-law principles to be considered in determining wheth-

The parties have not provided, and we cannot discern the difference, if any, in the outcome of this case whether the laws of Maryland or Delaware are applied to the facts of the present case. Counsel for Petitioner conceded at oral argument before this Court that there appears to be no difference between Maryland and Delaware law in terms of the duties owed a corporation by the members of its board of directors. Thus, any technical error on the part of the Circuit Court in its analysis of choice of law principles was harmless.

## B. Breach of Fiduciary Duty

*1. Filing the Initial Lawsuit and Pursuing the Entry of Summary Judgment by Default.*

■ It is well-settled that directors of a corporation "[o]ccupy a fiduciary relation to the corporation and its stockholders." *Booth v. Robinson*, 55 Md. 419, 436–37 (1881); *see Merchants Mortgage Co. v. Lubow*, 275 Md. 208, 215, 339 A.2d 664, 669 (1975); *Cumberland Coal & Iron Co. v. Parish*, 42 Md. 598, 605–06 (1875); *Malone v. Brincat*, 722 A.2d 5, 10 (Del.1998) ("The directors of Delaware corporations stand in a fiduciary relationship not only to the stockholders but also to the corporations upon whose boards they serve.") (citing *Guth v. Loft*, 5 A.2d 503, 510 (Del.1939)). This fiduciary relationship requires that a director "perform his duties . . .:(1) In good faith; (2) In a manner he reasonably believes to be in the best interests of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances." MD. CODE ANN. (1976, 1999 Repl.

---

er a particular state has a strong enough interest to overcome application of the "internal affairs doctrine":

 (a) the needs of the interstate and international systems;
 (b) the relevant policies of the forum;
 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issues;
 (d) the protection of justified expectations;
 (e) the basic policies underlying the particular field of law;
 (f) certainty, predictability and uniformity of result; and
 (g) ease in the determination and application of the law to be applied.

Vol.), CORPS. & ASS'NS ART., § 2–405.1(a); *see also Werbowsky v. Collomb,* 362 Md. 581, 599, 766 A.2d 123, 133 (2001); *Devereux v. Berger,* 264 Md. 20, 29, 284 A.2d 605, 611 (1971) (holding, prior to adoption of § 2–405.1, that directors of a corporation owe both a duty of care and loyalty to a corporation).

As such, directors of a corporation "are entrusted with powers which are to be exercised for the common and general interest of the corporation, and not for their own private individual benefit." *Booth,* 55 Md. at 436–37. Stated another way,

> "The affairs of corporations are generally intrusted to the exclusive management and control of the board of directors; and there is an inherent obligation, implied in the acceptance of such trust, not only that they will use their best efforts to promote the interest of the shareholders, but that they will in no manner use their positions to advance their own individual interest as distinguished from that of the corporation, or acquire interests that may conflict with the fair and proper discharge of their duty. The corporation is entitled to the supervision of all the directors, in respect to all the transactions in which it may be concerned; *and if one of the directors is allowed to place himself in the position of having his conduct and accounts made the subject of supervision and scrutiny, he, of course, cannot act, in regard to those matters, both for himself and the corporation."*

*Indurated Concrete Corp. v. Abbott,* 195 Md. 496, 503–04, 74 A.2d 17, 20 (1950) (quoting *Cumberland Coal & Iron Co.,* 42 Md. at 605–06). This fiduciary duty, furthermore, is not intermittent or occasional, but instead "the constant compass by which all director actions for the corporation and interactions with its shareholders must be guided." *Malone,* 722 A.2d at 10.

The Court of Special Appeals in the present case was correct to point out, however, that situations may arise where a corporate director, despite the requirement that a director

adhere strictly to his or her fiduciary obligations, may proceed with an individual plan of action even though the director's interests conflict directly with those of the corporation on whose board he or she sits. *Storetrax,* 168 Md.App. at 83, 895 A.2d at 374–75. " '[A]n interest conflict is not in itself a crime or a tort or necessarily injurious to others' and 'in many situations, the corporation and the shareholders may secure major benefits from a transaction despite the presence of a director's conflicting interest.' " *Shapiro v. Greenfield,* 136 Md.App. 1, 14, 764 A.2d 270, 277 (2000) (quoting DENNIS BLOCK, NANCY BARTON, & STEPHEN RADIN, 1 THE BUSINESS JUDGMENT RULE: FIDUCIARY DUTIES OF CORPORATE DIRECTORS 266 (5th ed.1998) (citing in turn 2 Model Bus. Corp. Act. Ann §§ 8.60 to .63, Intro. Comment at 8–397 (3 d ed.1996))). Commentators and courts in other jurisdictions have held that "a director or other corporate officer is not precluded from bringing an action against the corporation merely because he or she is a director or other officer, although to some extent the director or officer then represents both sides." 3 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 960 (perm.ed., rev. vol.1999) (hereinafter "FLETCHER"); *Hutchinson v. Phila. & Gulf S.S. Co.,* 216 F. 795, 798 (D.C.1914) (holding that no rule of law or equity prohibits a director from bringing suit against the company if he or she has a colorable claim); *Henshaw v. Am. Cement Corp.,* 252 A.2d 125, 126–27 (Del.Ch. 1969); *see generally also Sullivan v. Easco Corp.,* 656 F.Supp. 531 (D.Md.1987) (addressing, under Maryland law, whether a corporate director's right to exercise stock options, pursuant to an employment agreement between the director and the corporation obtained during the course of his employment as officer of the corporation, expired upon termination of his position).

Counsel for Petitioner conceded at oral argument before this Court that Gurland was not precluded from filing or maintaining the complaint against Storetrax. Counsel posited rather that the breach of fiduciary duty occurred when Gur-

land was silent "in the face of Storetrax's obvious ignorance of the lawsuit." When Petitioner did not file a response to Respondent's complaint and motion for summary judgment, according to Storetrax, Gurland should have been aware that some problem existed with notice to the corporation and, by pursuing summary judgment by default, Gurland put his personal interests ahead of the corporation in violation of his fiduciary obligations.

We have not addressed such a situation before, nor have we been able to find authority from another jurisdiction directly on point with the factual circumstances of the present case. We find apt, however, the reasoning employed by Maryland's intermediate appellate court here analogizing the conflicts which arise when a director sues his or her own corporation with those conflicts of interest which occur when a contract is entered between a corporation and one of its directors with a financial interest in the subject matter of the transaction.

When a member of a corporation's board of directors conducts business with his or her own corporation, as was the case here, there is an appreciable possibility that, at some point, the director's interests will diverge from the interests of the corporations. Where such a conflict of interest arises, courts scrutinize closely those dealings in order to ensure that the transaction is carried out consistent with notions of good faith and fair dealing on the part of the director. *See, e.g., Chesapeake Constr. Corp. v. Rodman,* 256 Md. 531, 536, 261 A.2d 156, 158 (1970); *Indurated Concrete Corp.,* 195 Md. at 503–04, 74 A.2d at 20; *McRedmond v. Estate of Marianelli,* 46 S.W.3d 730, 739–40 (Tenn.Ct.App. 2000); *Boston Children's Heart Found., Inc. v. Nadal–Ginard,* 73 F.3d 429, 433–34 (1st Cir.1996) (applying Massachusetts law). With this in mind, under both Maryland and Delaware law, the director may find "safe harbor" by disclosing to the corporation the conflict of interest and pertinent facts surrounding the conflict so that a majority of the remaining disinterested shareholders or directors may ratify the

transaction or, as the case may be, otherwise take action to protect the corporation's financial interests.

Section 2–419(a)–(b) of the Corporations and Associations Article, Maryland Code (1976, 1999 Repl.Vol.), governs such interested director transactions, and provides:

(a) *General Rule.*—If subsection (b) of this section is complied with, a contract or other transaction between a corporation and any of its directors ... is not void or voidable solely because of any one or more of the following: (1) The common directorship or interest; (2) The presence of the director at the meeting of the board or a committee of the board which authorizes, approves, or ratifies the contract or transaction; or (3) The counting of the vote of the director for the authorization, approval, or ratification of the contract or transaction.

(b) *Disclosure and ratification.*—Subsection (a) of this section applies if: (1) The fact of common directorship or interest is disclosed or known to: (i) The board of directors or the committee, and the board or committee authorizes, approves, or ratifies the contract or transaction by the affirmative vote of a majority of disinterested directors, even if the disinterested directors constitute less than a quorum; or (ii) The stockholders entitled to vote, and the contract or transaction is authorized, approved, or ratified by a majority of the votes cast by the stockholders entitled to vote other than the votes of shares owned of record or beneficially by the interested directors ...; or (2) The contract or transaction is fair and reasonable to the corporation.

*See also Sullivan,* 656 F.Supp. at 533–35 (discussing the history, purpose, and effect of § 2–419 as it pertains to employment agreements entered between a corporate director and the corporation); DEL. CODE ANN. tit. 8, § 144 (1953, 2005 Supp.). Thus, § 2–419 provides that "an interested director transaction is not void or voidable solely because of the conflict of interest and creates a 'safe harbor' for certain transactions which satisfy the statute." *Shapiro,* 136 Md.App.

at 14, 764 A.2d at 277. Under the statute, therefore, the transaction is not a breach of the interested director's fiduciary obligations to the corporation as long as the interested director informs the corporation and its directors of the conflicting interests and gives the board an opportunity to approve the transaction, i.e., protect the corporation's interests. *Shapiro,* 136 Md.App. at 14–15, 764 A.2d at 277.

Indeed, we have held that "[i]t is clear that officers and directors of a corporation stand in a sufficiently confidential relation to the corporation's stockholders [and the corporation] to impose a duty upon them to reveal all facts material to the corporate transactions." *Parish v. Md. & Va. Milk Producers Ass'n,* 250 Md. 24, 74, 242 A.2d 512, 539 (1968), *aff'd on reh'g,* 261 Md. 618, 277 A.2d 19, *cert. denied,* 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971) (concluding that a director's sale of assets of a dairy owned by a dairy farm cooperative, which, according to this Court, was analogous to a situation involving directors of a corporation, to a corporation for less than cost, without security, and without any payments, was gross negligence and mismanagement on the part of the director); *Booth,* 55 Md. at 436–37 ("The confidence reposed in [a corporate director], and the position they occupy towards the corporation and its stockholders, requires strict and faithful discharge of duty, and they are not allowed to derive from their position, either directly or indirectly, any profit or advantage whatever, *except it be with full knowledge and concurrence of the company, represented by other than themselves.")* (emphasis added).[11]

Although the analogy is by no means perfect, applying to the present case a requirement that the director notify the corporation of his intention to file a lawsuit against the corporation allows the director to assert his or her legal rights

---

11. A commentator likewise has explained that the obligations of good faith created by § 2–405.1(a)(1) impose upon corporate directors a duty of loyalty, fair dealing and candor, which encompasses the duty to disclose to the corporation material facts about any important matters involving the corporation. JAMES J. HANKS, JR., MARYLAND CORPORATION LAW § 6.6[b] (1990, 2005 Supp.).

against the corporation while giving the corporation, at the same time, the opportunity to act in defense of its own interests. In other words, this approach strikes the proper balance between Gurland's claimed legal right to seek severance payment under the terms of his employment agreement while, at the same time, requiring him also to fulfill his fiduciary obligation to act in Storetrax's best interests.

In the present case, there existed a conflict between Respondent's interests as an aggrieved former employee and his duty as a director of the corporation. His personal interests were adverse to those of the corporation because threatened or actual litigation is adversarial in nature. While Gurland endeavored to obtain severance payment under the employment agreement, he held at the same time a position of trust with Storetrax and was impressed with an obligation to act in the best interests of the corporation. Gurland's seeking severance pay from Storetrax in the amount of $150,000 clearly was not in the corporation's best interests. Under the circumstances, however, we believe that Respondent notified sufficiently the Petitioner of the imminence of a lawsuit such that he may claim the protections of the "safe harbor" annunciated above.

Respondent drafted and delivered to Storetrax on 11 December 2001 a letter outlining in detail his claimed entitlement to severance benefits under the termination provisions of the employment agreement. Included in that letter was a statement that Gurland had "consulted an attorney and [would] not hesitate to avail [himself] of every possible remedy in the event of dispute." Gurland stated further that "[i]f the issue remain[ed] unresolved as of [21 December 2001]," he would instruct his attorney to proceed. Not only did this agreement put Storetrax on notice that Gurland believed the employment agreement to be valid, it set a clear and reasonable deadline for when Gurland likely would file a suit.

It is equally clear from the record that Petitioner anticipated and was preparing for litigation as a result of the 11 December 2001 letter. Petitioner's 20 December 2001 letter

was an unequivocal rejection of Gurland's entitlement to severance payments. In that letter, counsel for Petitioner stated its position that even *if* the agreement were valid (which it did not concede), "cause" existed for Respondent's termination. The letter concluded in the following manner:

> If you desire to litigate this issue, the Company is prepared to defend itself, as well as to assert any counterclaims it may have against you for breach of your fiduciary duties as an executive and Director of the Company.

> The senior management of Storetrax and the Board of Directors (excepting yourself) have each reviewed this letter and the facts surrounding your demand for severance. Everyone concurs with the Company's refusal to consider any severance package.

It is clear that Petitioner was aware that a lawsuit likely was in the offing. The language used in the letter supports an inference that Storetrax neither attempted to defuse the situation, nor intended seriously to seek settlement of the claim. The letter further indicates that the board and senior management met, in the absence of Gurland, to discuss his claim and determined that severance was not due. Lastly, this letter indicates that Storetrax *engaged counsel* and informed Respondent through this counsel that the corporation would defend vigorously, and sue Respondent for breach of fiduciary duty if he proceeded as indicated in his 11 December 2001 letter.

Petitioner assumes that Gurland knew that Storetrax had no knowledge of the breach of contract action at the time he pressed for summary judgment by default. There is no evidence in the record to support that assumption; nor is there any evidence that Gurland "then secretly took advantage of that fact," as Petitioner suggests. To the contrary, Storetrax was served, through its resident agent, by Respondent with the summons, complaint, and motion for summary judgment entirely within the requirements set forth in Maryland Rule 2–124.

There is nothing in the record, other than Petitioner's failure to respond timely to the complaint and motion, which could have indicated to Respondent the failure of the resident agent to forward timely the documents to Storetrax. The resident agent's (or its contractor's) conduct is not attributable to Gurland. This is not a situation where Respondent acted to conceal the pendency of the lawsuit. The record, furthermore, does not highlight any instances where Storetrax, or its agents, inquired about the possible pendency of the promised lawsuit during one of Gurland's post-filing visits. Lastly, Respondent used no insider knowledge or confidential information in the course of enforcing what he perceived to be his legal right to severance payment. Under the circumstances, Respondent acted properly in pursuing summary judgment by default.

### 2. *Efforts To Enforce The Judgment.*

█ Storetrax argues further that it was a continuing breach of Gurland's fiduciary duties for him to seek a writ of attachment, garnish the bank accounts of the corporation, and to refuse to relinquish the writ, despite requests from the corporation for him to do so. We conclude that the Circuit Court and the Court of Special Appeals held properly that Gurland, as director, did not breach his fiduciary duties to Storetrax by obtaining and seeking to maintain attachment of the corporation's bank account.

█ We have been unable to locate any general rule of law forbidding a director from becoming a creditor of his or her corporation in the manner pursued here. Nor could we find any rule of law prohibiting generally a corporation's director from enforcing his or her claims against the corporation grounded on the director's fiduciary relationship with the corporation. To the contrary, most jurisdictions countenance corporate directors becoming creditors of the corporation, in the absence of bad faith or fraud. *See e.g., Beaver Park Co. v. Hobson,* 86 Colo. 559, 283 P. 772, 775–76 (1930). As one commentator states:

When a director or other corporate officer loans money to a corporation, or advances money for use of the company, *or otherwise becomes a creditor of the corporation,* questions arise as to what are his or her rights as such creditor as compared with other creditors who are not officers of the company.

A director or other corporate officer may, in a proper case, become a creditor of the corporation. *As a creditor, he or she ought to have the same rights, as the same remedies, to enforce his or her claim, as any other creditor, and his or her rights in these respects are as extensive as those of a creditor who is not a corporate officer.* He or she may sue the corporation as a creditor just as if he or she were not a director, and may secure a preference, where the corporation is not insolvent,[12] by issuing attachment or garnishment.

3 FLETCHER at § 907 (footnotes omitted) (emphasis added).

We conclude that Respondent acted within his rights when he filed a petition for writ of attachment at the earliest permitted opportunity after entry of summary judgment by default. Once Gurland became a judgment creditor of the

---

**12.** The trial court found it unclear whether the corporation was insolvent. Specifically, the Circuit Court held that

> the evidence is unclear as to whether the corporation was insolvent because the corporation was still a growing concern, had the power to draw down and use $500,000.00 investment funds as a cover for debts, and it is still a growing concern today. Had Mr. Gurland given prior notice, outside of the normal legal process, of a request to seek garnishment, a reasonable corporation would have taken steps, as was their right, to frustrate Gurland's efforts to collect what Mr. Gurland then believed to be a legitimate judgment.

We have defined several times in the past the concept of corporate "insolvency" to mean that the company is unable to pay its debts with all available assets as they become due in the ordinary course of business. *Family Sav. & Loan Ass'n S'holders' Protective Comm'n v. Stewart,* 241 Md. 89, 94, 215 A.2d 726, 729 (1966); *Wyman v. McKeever,* 239 Md. 130, 132, 210 A.2d 537, 538 (1965); *Mish v. Main,* 81 Md. 36, 43, 31 A. 799, 800 (1895). In other words, a corporation is insolvent when its liabilities are greater than its assets. The Circuit Court, on the record before it, was justified in not concluding that Storetrax was insolvent or that Gurland knew, or should have known, that it was.

business, he had the same right as any other creditor to enforce the judgment. As with the complaint and motion for summary judgment, nothing appears in the record to indicate that Gurland knew that Storetrax had not received notice of the entry of the judgment. To the contrary, the judgment entered by the trial court was a matter of public record at the time Respondent filed the petition for writ of attachment, and it would be reasonable for Gurland to assume that a copy of the judgment was delivered to Storetrax pursuant to Maryland Rule 2–501(f).[13] Thus, we conclude that it was not a violation of Gurland's fiduciary obligations as a director of Storetrax for him to garnish the corporation's bank account, despite not informing the corporation in advance that he would be seeking garnishment of its bank account.

We agree with the trial court's analysis: "The Court does not find any unfair advantage visited by director Gurland under the facts of this case when he honestly perceived the exercise of legitimate legal rights in satisfaction of a then legitimate judgment. He should be allowed to use the same means accorded any other creditor to collect his debt.... Under the facts of this case the Court finds no duty on director Gurland to give prior notice of his request for garnishment."

Petitioner relies on two cases in support of its proposition that Gurland owed Storetrax a fiduciary duty to give actual notice to the corporation before taking action adverse to its interests: *Union Ice Co. of Phila. v. Hulton*, 291 Pa. 416, 140 A. 514 (1928), and *Marr v. Marr*, 73 N.J. Eq. 643, 70 A. 375 (1908). Based on the unique factual circumstances of the present case, we find that these cases are distinguishable from the case at bar.

In *Marr*, a stockholder of Beacon Land Company, a closely-held New Jersey corporation, sued on behalf of himself and

---

13. Maryland Rule 2–501(f) provides that "[i]f the judgment is entered against a party in default for failure to appear in the action, the clerk promptly shall send a copy of the judgment to that party at the party's last known address appearing in the court file."

other stockholders to set aside a sheriff's sale of the corporation's real and personal property to William A. Marr, a director of the corporation. *Marr*, 70 A. at 376. The corporation was incorporated in 1892 for the purpose of owning and operating a hotel on the New Jersey shoreline. *Id.* In the years following its creation, the hotel's business began to flounder and, as a result, the corporation incurred considerable indebtedness. William Marr advanced various sums of money to the company and, by 1897, became the corporation's sole creditor.[14] *Id.* The board of directors had ceased to act meaningfully on behalf of the corporation and Marr was in sole charge of the business of the corporation. *Marr*, 70 A. at 378. The last director's meeting was held in July 1897, during which no official actions were taken. The last two shareholders' meetings occurred on 29 December 1897 and 16 February 1898. *Id.* It was at the final stockholder meeting that Marr announced to those present that "unless a sale of the property of the company could be effected, [Marr] would put his claims into judgment and sell the property." *Id.*

In September 1898, 15 months after the final directors' meeting and 8 months after the final shareholders' meeting, Marr filed, without further notice to the shareholders or directors, a complaint in the New Jersey Supreme Court and obtained judgment on the debt owed him by the corporation in the amount of $10,287.90. *Marr*, 70 A. at 376, 379. Subsequent to entry of this judgment, Marr caused in November and December 1898 the entire assets of the corporation to be sold at a sheriff's sale. *Marr*, 70 A. at 377. There was no advertisement of the sale beyond that required by the statute, and Marr was the sole bidder present and acting at the auction. *Id.* He purchased the property, real and personal, of the corporation for less than half of its fair market value. A stockholder of the corporation who, at the time of the original sheriff's sale, was a minor, sued in order to set aside the sale

---

**14.** Beacon Land Company owed Mr. Marrin excess of $8,500.00 by 1897, a considerable sum for the times. *Marr v. Marr*, 73 N.J. Eq. 643, 70 A. 375, 376 (1908).

or, in the alternative, have the assets declared purchased in trust for the benefit of the corporation's stockholders. *Id.*

The Court of Errors and Appeals of New Jersey held first that

> where [a director's] interest is opposed to that of the company, [all dealings between him and the company] will be regarded with jealousy and suspicion and subjected to the closest scrutiny, and not sustained against the stockholders, unless they are consistent with the utmost good faith and fair dealing on the part of the director.

*Marr*, 70 A. at 378. The court continued, however, that the director may bring an action against the corporation in order to proceed to judgment and execution on the debt owed to him so long as he does so "not covertly, but openly, and with fair notice to his company." *Id.*

According to the court,

> [t]he general notice given by defendant Marr at the meetings of December and February that, unless something was done about his claims, he would have to press them—the notice given hardly amounted even to a threat—did not, we think, dispense in fairness with the more specific notice that might and, in our view, ought to have been given when steps were actually imminent to sell the property of the company for the payment of his claim.

*Marr*, 70 A. at 379. The court stated, furthermore, that an important and perhaps controlling factor was that Marr acquired the real and personal property of Beacon for a price less than half the fair market value. *Id.*

In *Union Ice*, James Hulton, Sr., president of Union Ice Company of Philadelphia, made loans to the corporation in the amount of $33,000. 140 A. at 514. When the loans went unpaid, Hulton brought suit against the company, reduced the claims to judgment, and executed the judgment by causing the assets of the corporation to be sold at a sheriff's sale where he purchased the corporation's assets at a nominal price. *Id.* Neither notice of the issuance of the execution, nor notice of the time and place of the sale, was given to the corporation

and its directors/shareholders. Hulton's attorney, however, told "the directors that [Hulton] would have to reduce his notes to judgment, and that eventually he would have to sell the property." *Id.* Union Ice Company brought an action against Hulton in an attempt to compel him to account for the assets purchased. The trial court ruled in favor of the corporation, and Hulton noted a timely appeal.

The Supreme Court of Pennsylvania held that, while a corporate director or officer may enforce his or her claims against a corporation using the same methods available to any other creditor, he or she may not take unfair advantage of that relationship in doing so. *Union Ice,* 140 A. at 515. The director must be conscientious to ensure that some individual(s) acting on behalf of the corporation is aware of the current state of affairs such that the person(s) may safeguard adequately the interests of the corporation. *Id.* (citations omitted).

The court concluded that the notice given the corporation was insufficient and an accounting was appropriate under the circumstances. Specifically, the court held that the notice given by Hulton (and/or his attorney) "was vague and indefinite, only indicating a possible future intention [to reduce the notes to judgment and eventually sell the corporate property]. [Union Ice Company] [was] entitled to know when the execution issued, and the time and place of sale in order that they might take steps to protect the interests of the stockholders for whom they and defendant were trustees." *Union Ice,* 140 A. at 514–15 (citing *Gilmore v. Gilmore Drug Co.,* 279 Pa. 193, 123 A. 730 (1924)).

We believe that the factual circumstances regarding the quality and definitiveness of Gurland's notice to Storetrax make the present case distinguishable from *Marr* and *Union Ice.* In *Marr,* the director gave *oral* notice at a shareholders meeting that he would file suit at sometime in the future if a private sale of the corporate property was not affected in order to fulfill the debts owed to him. No specific deadline was given. Marr did not file suit until eight months later.

While Marr's oral notice barely amounted to even a "threat of litigation," Gurland gave direct written notice to Storetrax indicating his intention to file suit if the matter was not resolved by a date certain. When the deadline indicated in Gurland's letter expired, Gurland filed suit five weeks later. In other words, Gurland's notice to Storetrax indicated that litigation was imminent, and gave a definite time for which action on the part of Storetrax's board of directors was required to avert suit. He promptly made good his pledge.

*Union Ice* is distinguishable on similar grounds. The court held in that case that Hulton's notice to the directors was vague and indefinite. The notice did not establish any sort of time frame for forestalling action by the erstwhile defendant, informed the directors only that he would "eventually" reduce the claims to judgment, and indicated *possible* litigation in the future if the matter was not resolved. Gurland's notice to Storetrax was far more specific, and amounted to a direct threat of imminent litigation if the matter was not resolved. As such, we find that Gurland's notice to Storetrax of impending action adverse to the corporation's interests was sufficient and specific, and enabled Storetrax to act in its best interest, but for the failure of its resident agent to give it timely notice of the suit.

### 3. Gurland's Refusal to Lift the Garnishment.

Nor was it a breach of Gurland's fiduciary duty, as Petitioner argues, for him to refuse to relinquish voluntarily the garnishment or to oppose the corporation's efforts to set aside the judgment. As with the other situations before us in this case, we have not decided previously whether the fiduciary obligations that a director owes its corporation require the director to relinquish, at the request of the corporation, a judgment adverse to the corporation.

We find persuasive, however, *Waterfall Farm Systems, Inc. v. Craig,* 914 F.Supp. 1213 (D.Md.1995). In *Waterfall Farm Systems,* the Craigs, two minority shareholders (and directors) of a closely-held corporation, owned certain real prop-

erty which the corporation sought to lease for purposes of its business. *Waterfall Farm Sys., Inc.,* 914 F.Supp. at 1215. The corporation was in the business of growing and selling hydroponic produce.[15] *Id.* The business came into existence in 1990 when the Craigs met Edward Blume, who was in the business of selling hydroponic production systems. *Waterfall Farm Sys., Inc.,* 914 F.Supp. at 1216. The Craigs and Blume entered into a joint venture whereby the Craigs agreed to grow and sell hydroponic produce on their farm, and Blume agreed to construct on the property a greenhouse. *Id.* Blume introduced the Craigs to Linda and Colin Banks (the "Banks"). Mr. Banks agreed to help with the construction of the greenhouse. *Id.* Antonea and John Chapin (the "Chapins"), a couple who lived in the vicinity of the Craigs, became involved in the business venture as investors in 1992.[16] *Id.* Various problems arose between the Craigs and the Chapins in the years following creation of the corporation. *Waterfall Farm Sys., Inc.,* 914 F.Supp. at 1218. On 21 March 1994, the Craigs sent a letter to the Chapins indicating that Waterfall Farm Systems, Inc. was no longer welcome at the greenhouse on the directors' property, and that neither the Chapins nor any agents thereof were allowed on the property. *Waterfall Farm Sys., Inc.,* 914 F.Supp. at 1219–20. Subsequent to that date, the Craigs conducted business at the greenhouse under the name Future Farms. *Waterfall Farm Sys., Inc.,* 914 F.Supp. at 1220. On 11 May 1994, *Waterfall Farm Systems, Inc.,* at the direction of the Chapins, filed suit naming as defendants the Craigs and Future Farms. *Id.* The complaint alleged, *inter alia,* that the Craigs owed to Waterfall Farm Systems a duty of loyalty and fair dealing as officers and directors of the closely-held corporation, and that their at-

---

**15.** Hydroponics is the growing of plants without the use of soil. Instead, the plants are grown in containers filled with a water-based solution containing all the essential nutrients a plant needs to grow. *Waterfall Farm Sys., Inc. v. Craig,* 914 F.Supp. 1213, 1216 (D.Md.1995).

**16.** The parties formed a corporation which involved equal stock ownership by the Craigs, the Banks, and the Chapins. *Waterfall Farm Sys., Inc.,* 914 F.Supp. at 1216.

tempt to take over the business constituted a breach of that duty. *Waterfall Farm Sys., Inc.*, 914 F.Supp. at 1228.

The U.S. District Court for the District of Maryland began its analysis of the breach of fiduciary duty claims by stating that "Maryland law recognizes that an officer and director of a corporation occupies a fiduciary relationship as regards the corporation." *Id.* (citations omitted). The court continued, however, that "the mere fact that the Craigs were officers and directors of Waterfall did not impose on them a legal obligation to accede to demands of the Corporation which were adverse to their personal financial interest." *Id.* In the Craigs' capacity as lessors of the greenhouse, their interests were adverse to those of Waterfall Farm Systems, Inc. The court held, however, that it was not a breach of fiduciary duty for the Craigs to undertake to operate their own business in the greenhouse after termination of Waterfall's tenancy at will. In the absence of a binding written lease agreement, according to the court, it was not a breach of the Craigs' fiduciary duties to the corporation for them to terminate the lease over of the corporation's objections.

As we stated before, it was not a breach of Gurland's fiduciary duty for him merely to maintain a lawsuit in which Storetrax was an adverse party. *See* 3 FLETCHER at § 960; *Hutchinson*, 216 F. at 798; Henshaw, 252 A.2d at 126–27. Furthermore, to accept literally the reasoning that Respondent violated a fiduciary duty to the corporation merely because he failed to relinquish a legal interest at the corporation's request would mean that a corporation effectively could prohibit any director from suing the corporation of which he or she is a board member because the director would be obligated to cease pursuing his or her legal rights if the corporation requested it. That is not the law of this or any state, nor should it be. Instead, we find persuasive the reasoning employed by the court in *Waterfall Farm Systems.* Gurland had no legal obligation to accede to the demands of Storetrax to relinquish a judgment to which he then had a colorable right merely because the corporation asked him to do so.

70

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.